IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND and | ) | |
| LABORERS' WELFARE FUND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 05 C 4840 |
| | ) | |
| v. | ) | Wayne R. Andersen |
| | ) | District Judge |
| MIDWEST RAILROAD CONSTRUCTION, | ) | |
| INC., an Illinois Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the motion of Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (the "Funds"), and James S. Jorgensen (the "Administrator") (collectively, "Plaintiffs") for summary judgment. Plaintiffs brought this action against Midwest Railroad Construction Inc. ("Midwest"), Alan Szaks, and Edwin Thornley (collectively "Defendants") pursuant to 29 U.S.C. §§ 1132(e)(1) and (2), 29 U.S.C. § 185(a), and 28 U.S.C. §1331 based upon allegations that Defendants deprived the Funds of Employee Benefit Contributions and Union Dues. For the reasons set forth below, Plaintiffs' motion for summary judgment [76] is granted.

## BACKGROUND

The facts below are drawn from the parties' local rule 56.1 stipulation of material facts unless otherwise noted. The Funds are multiemployer benefit plans established and maintained pursuant to their respective agreements and declarations of trust. The Construction and General Laborers' District Council of Chicago and Vicinity (the "Union") authorizes the Funds to collect

two types of payments from employers who employ union workers: (1) amounts which have been or are required to be withheld from the wages of employees for payment of dues to the Union ("Union Dues") , and (2) amounts employers are required to contribute to employee benefit plans on behalf of each employee ("Employee Benefit Contributions"). Midwest is an Illinois corporation, and Alan Szaks and Edwin Thornley are officers and shareholders of the company. The Union and Midwest entered into a Collective Bargaining Agreement on November 1, 2003 (the "Collective Bargaining Agreement"). The Collective Bargaining Agreement incorporates by reference other agreements and declarations of trust, including the Chicago-Area Rail Contractor's Organization and the Construction and General Laborers District Council of Chicago and Vicinity Railroad Construction and Maintenance Agreement (the "Maintenance Agreement").

Plaintiffs believe that Midwest owes them the two types of amounts described earlier: (1) Employee Benefit Contributions and (2) Union Dues. The terms Working Dues and Union Dues are used in various instances in the documents submitted by the parties. We will use the term Union Dues for consistency. First we address Employee Benefit Contributions, and then we discuss Union Dues.

The Maintenance Agreement obligates Midwest to make contributions on behalf of its covered employees for pension funds, health and welfare benefits, and for training funds. The Maintenance Agreement further requires that Midwest submit to the Funds monthly remittance reports, which identify the covered employees and the amount of contributions to be made for each employee. (Parties' Local Rule 56.1 Stipulation of Material Facts at 3). Midwest submitted monthly reports to the Fund and reported that no employees worked during each of those months. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. D). Finally, the Maintenance

Agreement states that contributions not submitted in a timely fashion will be assessed at a 10% liquidated damages rate plus interest. (Parties' Local Rule 56.1 Stipulation of Material Facts at 3; Parties' Local Rule 56.1 Stipulation of Material Facts Ex. B at 20).

The Collective Bargaining Agreement states in paragraph three that the employer "shall deduct from the wages of employees uniform working dues in the amount of 1.5% of gross wages, or such other amount as directed by the union." (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. B ¶ 3). Untimely contributions for these Union Dues will be assessed at a 10% liquidated damages rate plus interest. (Parties' Local Rule 56.1 Stipulation of Material Facts Ex. B Art. IX ¶ 2).

Pursuant to the Maintenance Agreement, Midwest must submit its books to the Funds for an audit to determine if Midwest is in compliance with its contribution responsibilities. The Funds conducted two audits that gave rise to the instant lawsuit. Plaintiffs' four–count complaint consists of two counts for the audit period of November 1, 2003 through October 31, 2004 and two counts for the audit period of November 1, 2004 through September 30, 2006. Counts I and III allege that Midwest failed to pay Employee Benefit Contributions on behalf of its employees during the time periods of the audits. Counts II and IV allege that Midwest failed to pay Union Dues that Midwest should have deducted from the wages of covered employees.

## **LEGAL STANDARD**

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that no genuine issue of material fact exists and therefore, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The existence of a factual dispute is not enough to defeat summary judgment; rather the non-moving party must present definite, competent evidence to rebut the motion for

summary judgment. *See Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). A genuine issue of material fact exists only when the evidence is such that a reasonable jury could find in favor of the non-moving party. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 277, 248 (1986). When deciding a motion for summary judgment the Court must construe all facts and draw all reasonable inferences in a light most favorable to the non-moving party. *See id.* at 255.

## **DISCUSSION**

Plaintiffs assert four counts in their complaint, two for each audit performed. One count for each audit period asserts that Midwest failed to pay Employee Benefit Contributions on behalf of its employees; the other count for each audit period asserts that Midwest failed to pay Union Dues it should have deducted from the covered employees wages for the time periods covered in the audits. Employees must be "Covered Employees" performing "Covered Work" before Midwest's is obliged to pay the amounts the Funds asserted in their compliant. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. D). The Funds assert that the only issue of material fact is whether these employees performed Covered Work, and that the unambiguous language of the contract obligates Midwest to pay the outstanding amounts due on the audit. (Pls.' Mem. Supp. Summ. J. at 7). The Funds assert that Midwest employed Covered Employees during the time periods at issue, despite the fact that Midwest leased its employees from a company called Labor Ready. Midwest asserts that Paragraph 3 of Article IX of the Railroad Construction and Maintenance Agreement creates a condition precedent that requires the Funds to give Midwest notice prior to Midwest having any obligation to pay Employee Benefit Contributions and withhold Union Dues, and that this condition precedent was never satisfied.

We find that Plaintiffs are entitled to summary judgment on all four counts of their complaint because, under the plain language of the Collective Bargaining Agreement and the

Maintenance Agreement, (1) Midwest clearly employed Covered Employees performing Covered Work during the audit periods, (2) the Funds were not required to give Midwest notice of an obligation to pay Employee Benefit Contributions and Union Dues, and (3) even if notice was required, Midwest had actual notice of its obligation to pay said Employee Benefit Contributions and Union Dues.

Plaintiffs bring this action against Midwest and against Alan Szaks and Edwin Thornley, individually. Plaintiffs allege Szaks and Thornley fraudulently and intentionally failed to report and submit dues owed to the Funds. (Pl's Amend. Compl. ¶ 29). The parties' summary judgment briefs focus solely on Midwest, the company, as a defendant and not the individuals. Therefore, the following analysis applies to only the company defendant, Midwest.

### I. Midwest's Leased Employees Were Covered Employees Performing Covered Work

Midwest's employees were Covered Employees and performed Covered Work under the Collective Bargaining Agreement. Midwest did not argue that the employees were not Covered Employees, nor that paragraph four of the Collective Bargaining Agreement, entitled "Work Jurisdiction," is ambiguous in this regard. Midwest failed to address this portion of the agreement at all. Nevertheless, the issue of whether the employees were Covered Employees performing Covered Work is a required element to Plaintiffs' claim, and therefore we will discuss it briefly.

This issue is essentially one of contract interpretation. Therefore, its resolution on summary judgment is proper, because while all factual issues must be viewed in favor of the non-moving party, whether a contract is ambiguous is determinable as a matter of law. *Barnett v. Ameren Corp.*, 436 F.3d 830, 833 (7th Cir. 2006), (citing *Diehl v. Twin Disc, Inc.*, 102 F.3d

301, 305 (7th Cir. 1996)). We must determine if the contract is ambiguous, and if we find that it is unambiguous, we can interpret the meaning of the contract as a matter of law. *Id.*

The Collective Bargaining Agreement covers all work performed within the Union's work jurisdiction. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. B ¶ 4). It further provides that,

> [t]he Employer, whether acting as a contractor, general manager, or developer, shall not contract or subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work coming within the above-described jurisdiction of the Union to any person, corporation or entity not signatory to and covered by a collective bargaining agreement with the Union. This obligation applies to all tiers of subcontractors performing work at the site of construction. *When the Employer contracts out or sublets any of the work coming within the above-described jurisdiction of the Union, it shall assume the obligations of any such subcontractor for prompt payment of employees' wages and other benefits required under this Agreement*, including reasonable attorneys fees incurred in enforcing the provisions hereof.

(Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. B ¶ 4) (emphasis added).

The clear and unambiguous language provides that the employer may not sub-contract or contract out any work unless that entity is a signatory contractor. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. B ¶ 4). If the employer does sub-contract out the work, the employer is responsible for any and all payments required under the Collective Bargaining Agreement. This language does not use any ambiguous terms, rather it specifies exactly what will occur if work is subcontracted. Therefore, we find that this language is unambiguous.

Under this unambiguous language, Midwest's leasing its employees from Labor Ready does not exempt it from its obligation to pay employees' wages and other benefits required under the Collective Bargaining Agreement. To the contrary, the Collective Bargaining Agreement holds Midwest responsible for "prompt payments of employees' wages and other benefits required under this Agreement." This clear and unambiguous language imposes a responsibility

6

on Midwest for payments if Midwest subcontracts out its work, and we therefore find that Midwest employed Covered Employees who performed Covered Work during the time periods at issue.

### II. The Funds Were Not Required to Give Midwest Notice Prior to Midwest's Obligation to Pay

No condition precedent existed requiring the Funds to give Midwest notice of its obligation to pay Union Dues before the obligation to pay those dues became effective.

Midwest argues that the Maintenance Agreement required the Funds to give notice to Midwest before Midwest would have any obligation to pay. Midwest points to Article IX, paragraph three of the "Check Off and Dues Deduction" section of the Maintenance Agreement. That section provides, in pertinent part:

> The Union will submit to the Employer a written statement of respective amounts of initiation fees, or other fees and Union dues due the Union. The Employer will then deduct said amount from each Employee's pay every weekly pay period until the total amount of initiation fees or other fees and dues have been deducted.

(Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. A ¶ 3). Midwest argues that this provision places an affirmative duty on the Funds to send Midwest written notice of any fees or dues owed to the Funds before any fees or dues actually become due. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. at 3).

The Funds argue that this paragraph only applies to withholding *additional* initiation fees and dues. (Pls.' Reply to Pls.' Mem. Supp. Summ. J. at 1)(emphasis added). The Funds assert that the previous paragraph in the Maintenance Agreement, paragraph two, is the paragraph that controls payment of Union Dues. (Pls.' Reply to Pls.' Mem. Supp. Summ. J. at 2). Paragraph two states:

> All Employers covered by this Agreement shall deduct from the wages of employees covered by said contract, working dues in the amount of 1.5% of gross

7

wages or such amount approved by the Union for each hour worked and shall
remit monthly to the Chicago District Council the sums so deducted.
(Parties Local Rule 56.1 Statement of Material Facts Ex. B at 26).

As stated previously, whether a contract is ambiguous is a question of law that a court can address on summary judgment. *Barnett v. Ameren Corp.*, 436 F.3d 830, 833 (7th Cir. 2006), (citing *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996)). Seemingly ambiguous provisions may be disambiguated in other parts of the agreement. *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 545 (7th Cir. 2000). Further, contractual provisions must be read in a manner that gives them consistent meaning. *UAW v. Rockford Powertrain Inc.*, 350 F.3d 698, 703 (7th Cir. 2003).

In the present case, Midwest attempts to place emphasis on paragraph three while completing ignoring paragraph two. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J.). Interpreting these paragraphs consistently, paragraph two's statement that "employers shall deduct working dues" clearly places an affirmative duty on *employers* to deduct these dues. Paragraph three requires the Funds to give notice to Midwest if "initiation fees, or other fees and Union dues" must be withheld. Clearly, one paragraph cannot impose a duty on Midwest and the other one a duty on the Funds. "[O]ther fees and union dues" in paragraph three must relate to just that, *other* fees and union dues.

This interpretation is also the logical way of interpreting the Maintenance Agreement. The Funds could not be required to give notice to Midwest to withhold fees and dues if the Funds were unaware Midwest employed employees. The Maintenance Agreement correctly places the burden on Midwest to withhold the exact percentage of Union Dues that the agreement calls for. Midwest is in a better position than the Funds to know if Midwest has employees working for it and whether or not Union Dues must be withheld. Therefore, with respect to Counts II and IV,

paragraph two of the Maintenance Agreement applies, and the Funds did not have a duty to give Midwest notice prior to the commencement of Midwest's obligation to pay Union Dues.

Neither party addressed whether or not any agreement required the Funds to give Midwest notice of the Employee Benefit Contributions. Regardless, as we discuss below, we find that Midwest had actual notice of the obligation to pay both Employee Benefit Contributions and Union Dues. Therefore, we need not address whether or not the Funds were required to give Midwest notice of the Employee Benefit Contributions.

### III. Midwest had Actual Knowledge of its Obligation to Pay Employee Benefit Contributions and Union Dues

Even if the Funds had a duty to notify Midwest of its obligations regarding Union Dues or Employee Benefit Contributions, the Funds did give Midwest notice, and Midwest had actual knowledge of its duty to pay Employee Benefit Contributions and Union Dues.

#### A. Employee Benefit Contributions

Midwest had actual knowledge of its duty to pay Employee Benefit Contributions based on the number of hours the employees worked. The Maintenance Agreement obligated Midwest to submit monthly reports containing employee names, the hours they worked, and the amounts of the benefits that Midwest would contribute to the Funds based on those hours worked. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. D). The Funds submitted the report templates to Midwest with the applicable contribution rates for each monthly time period. The report templates contained columns that specified each applicable fund and the pre-specified rate amounts that applied to the respective funds. The next column contained a heading for "Total Hours and Amount." (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. D). These pre-filled portions of the template that the Funds submitted to Midwest gave Midwest notice that it must

record the hours that employees worked during the applicable time period. Based on the hours reported, the rate column gave Midwest the rate at which it should calculate Employee Benefit Contributions.

Midwest reported in each of its monthly reports that no employees worked, and therefore it did not complete the calculations for Employee Benefit Contributions for each employee. If Midwest had in fact reported that employees were working during the applicable time periods but failed to compute Employee Benefit Contributions for those employees, the Funds would have had the opportunity to correct that computation. Because the monthly reports contained pre-determined rate amounts for each of the specific funds, Midwest had actual notice of its obligation to pay Employee Benefit Contributions for the employees at those rates, based on the hours they worked. Midwest's sole argument is that it did not have an obligation to pay until it received written notice, and we find that Midwest actually did receive written notice. Therefore, summary judgment is granted with respect to Counts I and III for failure to pay Employee Benefit Contributions.

        **B.    Union Dues**

Midwest had actual knowledge of its duty to withhold Union Dues from employees' compensation and its responsibility to pay those Union Dues if it failed to properly withhold those amounts. Midwest argues that it did not receive relevant industry wide collective bargaining agreements at the time it signed the Collective Bargaining Agreement, and therefore it did not have notice of the provisions requiring it to pay the dues. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. at 3). The Funds argue that Midwest received all the applicable trust documents and collective bargaining agreements on November 18, 2003, before Midwest's first reports were

due, and therefore Midwest had ample time to know of its obligations before they were due. (Pls.' Reply to Pls.' Mem. Supp. Summ. J. at 3–4).

We need not conclude what ancillary documents each party had to determine that Midwest had actual knowledge of its duty to withhold Union Dues. Midwest was obviously aware of the Collective Bargaining Agreement and the Maintenance Agreement, and those agreements provided the notice. Paragraph two of the Maintenance Agreement states that Midwest shall deduct working dues in the amount of 1.5% of the employees' gross wages. (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. A). Paragraph three of the Collective Bargaining Agreement that Midwest signed on November 1, 2003 states that, "[t]he Employer shall deduct from the wages of employees uniform working dues in the amount of 1.5% of gross wages . . . and shall remit monthly to the designated Union office the sums so deducted . . . ." (Defs.' Resp. to Pls.' Mem. Supp. Summ. J. Ex. D). This clear and unambiguous language on the face of these agreements gave Midwest written notice of its obligation to withhold Union Dues and remit them to the Funds. Even if the Funds had an obligation to give Midwest notice of its obligation to withhold Union Dues, the Funds gave Midwest written notice of this obligation through these agreements. Therefore, Plaintiffs' motion for summary judgment is granted with respect to Counts II and IV for failure to pay Union Dues.

### IV.    Amount Owed

Midwest did not contest the accuracy of the audits performed on behalf of the Funds in its response to Plaintiffs' Statement of Material Facts. Pursuant to local rule 56.1(b)(3)(C), "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Therefore, we accept

those audit results as accurate, and we award Plaintiffs the full amount of the sum certain requested, $620,669.41.

Furthermore, we award Plaintiffs attorneys' fees and expenses in the amount of $16,289.60, as provided in the stipulation filed on May 5, 2010.

## **CONCLUSION**

Because we find that Midwest had actual knowledge of its obligation to pay Union Dues and Employee Benefit Contributions, Plaintiffs' motion for summary judgment on Counts I – IV [76] is granted. Judgment is entered against Midwest on all four counts, and Midwest is ordered to pay the Funds $620,669.41 as determined by the audits, plus $16,289.60 in attorneys' fees and expenses.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: May 5, 2010